Deena R. Bernstein
United States Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 23rd Floor
Boston MA 02110
GA Bar 054068
(617) 573-4590 (fax)
bernsteind@sec.gov
(617) 573-8813 (office)

Attorney for the United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Securities and Exchange Commission, | ) | No. |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Alliance Transcription Services, Inc.; | ) | **COMPLAINT** |
| Clifford A. Lewis; Richard A. Dabney; | ) | |
| Raymond C. Dabney; | ) | |
| Philip M. Young; Charles J. Smith; and | ) | |
| William D. O'Neal, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff United States Securities and Exchange Commission ("Commission") alleges the following against Defendants Alliance Transcription Services, Inc. ("Alliance" or "Company"), Clifford A. Lewis ("Lewis"), Richard A. Dabney, Raymond C. Dabney, Philip M. Young ("Young"), Charles J. Smith ("Smith"), and William D. O'Neal ("O'Neal"):

## SUMMARY

1.     This matter concerns a scheme to manipulate the price and trading volume of Alliance stock through false and misleading public disclosures and to issue and sell Alliance stock in an unregistered distribution from at least April

2005 through at least September 2006.  Alliance, a Nevada corporation, purported to provide unique expertise in the field of homeland security, and its common stock was quoted at all relevant times on the Pink OTC Markets quotation system formerly known as the Pink Sheets.

2.      Defendants Alliance, Richard Dabney, and Lewis manipulated the market for Alliance's stock by making false and misleading public disclosures in press releases issued by Alliance and published through business newswire services and on Alliance's website.

3.      Defendants Alliance, Richard Dabney, Raymond Dabney, Young, Smith, and O'Neal participated in the unregistered distribution of Alliance securities from July 2005 to September 2006 through a series of purported offerings by Alliance to a Texas company controlled by Smith.  Raymond Dabney, Young, and Smith arranged for Alliance to issue stock to the Texas company in offerings that purportedly were exempt from registration and through which stock certificates purportedly could be issued without printed legends restricting the stock's resale.  In fact, the transactions between Alliance and Smith's company were not exempt from registration and were merely a device to evade the registration provisions of the federal securities laws.  Once issued to Smith's company, the stock was immediately distributed to third parties without being paid for by Smith.  Richard Dabney and O'Neal enabled Alliance to engage in those transactions by providing the necessary corporate resolutions and legal opinions, respectively.

4.      Defendants Young, Smith, and O'Neal received Alliance stock through the unregistered distribution and sold it into the market without registration or a valid exemption from registration.  Defendants Lewis, Richard Dabney, and Raymond Dabney received a portion of the proceeds that Young obtained by selling the Alliance stock.

5.      By their conduct, Alliance, Lewis, and Richard Dabney violated

2

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Alliance, Richard Dabney, Raymond Dabney, Young, Smith, and O'Neal violated Section 5 of the Securities Act of 1933 ("Securities Act").

6.     The Commission seeks relief including:  permanent injunctions against all the Defendants; disgorgement of ill-gotten gains plus prejudgment interest thereon and civil monetary penalties against Lewis, Richard Dabney, Raymond Dabney, Young, Smith, and O'Neal; penny stock bars against Lewis, Richard Dabney, Raymond Dabney, Young, and Smith; officer-and-director bars against Lewis and Richard Dabney; and any other appropriate relief.

## JURISDICTION

7.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

8.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.     In connection with the acts, transactions, practices, and courses of business alleged in this Complaint, the defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, the mails, or the facilities of any national securities exchange.

## THE DEFENDANTS

10.     **Alliance** is a Nevada corporation that is based in Rancho Palos Verdes, California, and was based in Harrison, Maine, at all relevant times.  From December 2004 to August 2007, the Company, which was then known as Strategy X, Inc., purported to provide unique expertise in the field of homeland security.

3

Alliance's common stock was quoted on the Pink Sheets at all relevant times, but it has not traded actively since October 4, 2007, when the Commission ordered a 10-day trading suspension pursuant to Section 12(k) of the Exchange Act [15 U.S.C. § 78l(k)].  At all times relevant to this Complaint, Alliance's common stock has been a penny stock because the Company's net tangible assets and average revenues have been below the thresholds established under Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], and the securities have traded at a price below $5 per share at all times since the stock began trading.

11.    **Lewis**, age 44, resides in Huntsville, Alabama, and resided in Harrison, Maine, at all relevant times.   He was the president, chief executive officer, and a director of Alliance at all relevant times and was responsible for business development and the day-to-day operations of the Company.  Lewis caused Alliance to make false and misleading public disclosures in press releases and on its website.

12.    **Richard Dabney**, age 40, resides in Rancho Palos Verdes, California, and resided in Torrance, California, at all relevant times.  He was the managing director and treasurer of Alliance beginning in December 2004 and was responsible for Alliance's financial matters.  Richard Dabney caused Alliance to make false and misleading public disclosures and to engage in the unregistered distribution of its securities.

13.    **Raymond Dabney**, age 43, resides in Vancouver, British Columbia, Canada.  He is the brother of Richard Dabney and, from December 2004 to approximately November 2005, was a member of Alliance's board of directors. Although Raymond Dabney ceased to be publicly identified as an officer or director of Alliance following a November 2005 disciplinary proceeding brought by the British Columbia Securities Commission that barred him from serving as an officer or director of any issuer, he continued to exercise great influence over the

4

Company and personally directed the unregistered distribution of Alliance securities.

14.   **Young**, age 84, resides in Phoenix, Arizona.  He was the founder and chairman of First American Stock Transfer, Inc. ("First American") in Phoenix, Arizona, the transfer agent for Alliance and its predecessors from approximately 1987 to June 2006.  From August 2006 to May 2007, Young was the owner and president of First National Stock Transfer, Inc. in Phoenix, Arizona, which was the transfer agent for Alliance during that period.  He initiated and personally participated in the unregistered distribution of Alliance securities. Young received a portion of the purportedly unrestricted Alliance stock issued in those transactions and sold the shares into the market through a brokerage account.

15.   **Smith**, age 60, resides in Reno, Nevada, and is a consultant to private companies seeking to raise capital.  He served as a conduit for the unregistered distribution of Alliance stock.  Smith received a portion of the purportedly unrestricted Alliance stock issued in those transactions as compensation for his services, and he sold the shares into the market through a brokerage account.

16.   **O'Neal**, age 48, resides in Fountain Hills, Arizona.  He is an attorney who is licensed to practice law in Arizona and specializes in securities law.  O'Neal issued numerous legal opinion letters that facilitated the unregistered distribution of securities by Alliance.  He was paid for his services with a portion of the purportedly unrestricted Alliance stock issued in those transactions and sold the shares into the market through a brokerage account.

## STATEMENT OF FACTS

### A.   Background

17.   Alliance was incorporated by Young in Nevada in 1996 under the name Arizigon Corporation.  Between April 1996 and December 2004, the Company was essentially a corporate shell and changed name and management

several times.

18.     In December 2004, the majority shareholders sold their interests in Alliance, then called Strategy X, Inc., to an entity controlled by Raymond Dabney. Raymond Dabney, Richard Dabney, and Lewis became officers and/or directors of Alliance and launched a business purporting to provide unique expertise in the field of homeland security.

19.     At all relevant times, Alliance stock was quoted on the Pink OTC Markets quotation system formerly known as the Pink Sheets, but the Company has never registered its securities or filed reports with the Commission.

20.     During the period from December 2004 to mid-2005, Young was the chairman and president of First American, the transfer agent for Alliance.  After his daughter succeeded him as president, Young retained his position as chairman of First American until June 2006.

### B.     Alliance Issues False and Misleading Press Releases

21.     From December 2004 through at least November 2006, Alliance issued and published a stream of press releases through business newswire services and on its own website.  As a regular practice, Lewis and Richard Dabney reviewed, edited, and approved each press release prior to its publication.  Some of the press releases contained material false or misleading statements regarding Alliance's contracts and revenues.

### 1.     Radian, Inc.

22.     In April 2005, Alliance became a subcontractor to Radian, Inc., which had a contract (the "Prime Contract") with the Department of Defense to design and install intrusion detection systems to protect a number of U.S. military installations.  Alliance was one of a number of subcontractors that provided workers to do some of that work.   Both the Prime Contract and the Alliance subcontract were "indefinite-delivery-indefinite-quantity" contracts, meaning that there was no guarantee as to how much work would be ordered, if any.  According

to its terms, the subcontract could be terminated by either party unilaterally at any time, and no minimum amount of work or minimum payment to Alliance was guaranteed.  Until a work order was issued by Radian, it was not possible for Alliance to know or even reasonably to estimate how much it would earn on any particular project; similarly, it was not possible for Alliance to know or even reasonably to estimate how much it would earn on the subcontract as a whole.

23.     Nevertheless, on April 26, 2005, Alliance issued a press release with the headline, "[Alliance, Inc.] Secures $6,000,000 Contract to Support Several US Department of Defense Locations."  As of that date, Radian had not issued a single purchase order to Alliance.  In their capacities as executive officers of Alliance, Richard Dabney and Lewis each reviewed and approved the April 26, 2005 press release prior to its publication.  Lewis calculated and inserted the $6 million figure into the release, despite the fact that there was no reasonable basis for it and the information was materially false and misleading.  Both Richard Dabney and Lewis were familiar with the terms of the subcontract and knew that it did not set out the amount of work to be done by Alliance or the total amount of money that Alliance would be paid during the course of the subcontract.  Both of them also understood that, when Radian was ready to assign specific work to Alliance, it would issue purchase orders stating the location, period of performance, man hours, and labor rates.

24.     On April 26, 2005, the day of the announcement, the trading volume of Alliance's stock increased almost tenfold from the previous day, from 24,050 shares to 229,915 shares, and its stock price increased by 47%, from $0.15 to $0.22 per share.

25.     At all relevant times, Richard Dabney and Lewis were constantly concerned with attracting investors to Alliance and were keenly aware of the influence that Alliance's press releases could have on investors.  For example, in a March 23, 2005 e-mail concerning a draft of what would become Alliance's April

26, 2005 press release, Lewis told Radian's program manager in charge of the Prime Contract that, "as a publicly traded company we depend on these stupid releases to keep our investors happy and the money flowing in."

26.     Thereafter, with Richard Dabney's and Lewis's review and approval, Alliance continued to issue and publish press releases regarding the subcontract with Radian, claiming ever increasing but unjustified contract values. In a September 21, 2005 press release, Alliance claimed that its "Department of Defense (DoD) teaming contract originally worth more than $5,000,000 has been expanded once again" and was now "worth over $8,250,000."  On November 7, 2005, Alliance issued another press release stating that the Company was "expanding the scope of their current 8.5 million dollar Department of Defense (DoD) contract."  The trading volume of Alliance stock increased significantly with each of those announcements, although the stock price did not increase.  The claimed value of the subcontract in both of those press releases was materially false and misleading because there was no reasonable basis for the figures.  On each occasion, the total value of the purchase orders issued by Radian to date was a small fraction of the amounts claimed by Alliance.

### 2.     <u>Vindicator Technologies</u>

27.     In April 2005, Alliance contacted Vindicator Technologies ("Vindicator") in Austin, Texas, to try to establish a business relationship. Vindicator manufactures and installs security equipment and is now a business unit of Honeywell International, Inc. known as Honeywell Vindicator Security Solutions.  The companies took preliminary steps by executing a non-disclosure agreement and arranging for several Alliance employees to attend a Vindicator training program, which Vindicator required as a pre-condition to entering into any substantive contractual relationship with a prospective subcontractor. Alliance did not pay the required fee to Vindicator, however, and did not send its employees for training.  The companies never developed a business relationship

and never entered into any substantive contract.

28.     Nevertheless, on June 22, 2005, Alliance issued a press release, reviewed and approved by Richard Dabney and Lewis, announcing that it had "opened negotiations with Vindicator Technologies, Inc. to provide Survey, Installation, and Integration Management support to Vindicator installations."  The press release also stated that the negotiations "could lead to a positive cash flow ranging from 1-10 million dollars."

29.     The disclosure by Alliance in its June 22, 2005 press release is materially false and misleading because there was no reasonable basis for the projected cash flow figures based on doing work for Vindicator.  Alliance never took the prerequisite step of having its staff trained by Vindicator, and the companies never discussed any specific potential projects that might generate cash flow for Alliance.  Lewis simply calculated the cash flow figures and inserted them into the press release, which he and Richard Dabney published without discussing or checking the information with Vindicator.

### 3.     Communication Solutions, Inc.

30.     On January 10, 2006, Alliance issued a press release stating that "[Alliance] is pleased to announce they have finalized a $2.5 million Homeland Security contract with Communication Solutions, Inc. for the State of Maine."  The press release was drafted by Lewis and reviewed, edited, and approved for publication by Richard Dabney.  The release further claimed that "[Alliance] will be providing system engineering, program management, as well as write and submit [sic] subsequent follow-on state and federal grants."  These statements are materially false and misleading because no such contract was ever finalized, or even negotiated, between the companies.  Communication Solutions had no substantive agreement with Alliance and no contract with the State of Maine.  On the day of the announcement, Alliance's trading volume increased substantially from 851,079 shares to 1,401,185 shares, and its stock price increased slightly

from the previous day, from $0.085 to $0.091 per share.

### C.   Unregistered Distribution of Alliance Stock

#### 1.   Purported Sales to North American Funding

31.   In or about July 2005, various of the Defendants put into effect a scheme to evade the securities registration provisions of the federal securities laws.  At that time, Young telephoned Smith, whom he had known and done business with for several years.  Smith was then the sole officer, director, and employee of North American Funding, Inc. ("NAF"), a Texas corporation.  Young told Smith that Alliance needed to raise some capital and wanted to use NAF to conduct a private placement because of an exemption from federal securities registration requirements he believed was available to a Texas corporation.

32.   Young told Smith that, in connection with the private placement, Alliance would direct First American to issue a stock certificate to NAF and Smith would then instruct First American to "break the certificate down" and redistribute the shares to the purported real investors, who would pay for them.  Young assured Smith that Smith would not have to pay for the Alliance stock and that he would be compensated with shares of Alliance stock for his efforts.  Smith agreed to participate in the transaction.

33.   On July 28, 2005, First American issued a stock certificate to NAF representing two million purportedly unrestricted shares of Alliance stock.  The certificate was held at First American and not delivered to Smith.  Shortly afterward, Young telephoned Smith and directed him to instruct First American to cancel the stock certificate and to issue new certificates redistributing the shares to third parties.  Young told Smith to whom the shares were to be issued and in what quantities.  Smith complied with Young's directions and sent instructions to First American.  The Alliance shares issued to NAF were redistributed accordingly.

34.   In mid-August 2005, less than one month after the first transaction, Young again telephoned Smith and told him that Alliance needed to issue

additional stock to raise more money.  Smith again agreed to participate in the transaction.  The process described above was repeated throughout the ensuing year, with Young initiating the contact on each occasion.  Between July 2005 and September 2006, Alliance issued more than 60 million shares of purportedly unrestricted stock to NAF in a series of at least 15 transactions.  On each occasion, the shares issued to NAF were immediately redistributed to third parties and sold into the market.  In most instances, Young, Smith, and O'Neal received some of the shares.

35.     Alliance did not file a registration statement with the Commission, and none was in effect, for any of the Alliance offerings to NAF.

36.     Although Raymond Dabney had no official title at Alliance after November 2005, he acted as a behind-the-scenes executive officer and directed much of the Company's activities.  Alliance's two principal officers, Richard Dabney and Lewis, looked to Raymond Dabney for guidance on managing the Company, including the issuing of stock and the content of press releases.

37.     In most of the transactions between Alliance and Smith, Raymond Dabney instructed Young as to how the Alliance stock issued to NAF was to be redistributed to third parties, and Young conveyed those instructions to Smith.  In some instances, however, Raymond Dabney delivered the instructions directly to Smith.

38.     For each of the transactions between Alliance and Smith, Alliance's transfer agent, First American, required that the Company provide it with certain documentation, including a corporate resolution approving the stock issuance.  In each instance, Richard Dabney, as an executive officer of Alliance, provided the necessary signed corporate resolution authorizing the stock issuance to NAF.

### 2.     O'Neal Provides Legal Opinion Letters

39.     First American also required, as to each transaction, a written opinion of counsel.  In each instance, O'Neal prepared and delivered to First

American a legal opinion stating that the offering by Alliance was exempt from registration under the Securities Act and that the stock certificate could be issued to NAF without any restrictive legend as to the resale of the shares.  Based on O'Neal's legal opinions, Alliance was able to issue more than 60 million shares of stock without any restrictive legend to NAF as part of the unregistered distribution.

40.     The legal opinions issued by O'Neal stated that the transactions were exempt from registration under the Securities Act and that the stock certificates could be issued without restrictive legend.  The opinions purported to rely on certain provisions of Regulation D under the Securities Act and on certain provisions of Texas state law.  The provisions cited in O'Neal's legal opinions, however, did not confer the claimed exemption or permit the stock certificates to be issued without a restrictive legend.

41.     NAF was not a bona fide purchaser and merely served as a conduit for the unregistered public distribution of Alliance stock.  In fact, Smith's sole function in the transactions was to give the false appearance in the records of the issuer and the transfer agent that Alliance had sold its stock to a Texas corporation.

**3.     Young Agrees to Split Proceeds With Alliance**

42.     In or about August 2005, Young and Raymond Dabney entered into an oral agreement that a portion of the Alliance shares issued to NAF in future transactions would be transferred to Young.  They agreed that Young would deposit the shares into a brokerage account, sell them into the market, and split the proceeds with Alliance.  From at least August 2005 to September 2006, Young received at least 29.6 million shares of the Alliance stock issued to NAF and obtained net proceeds of approximately $357,276 by selling the shares into the market.

43.     Richard Dabney was aware of the agreement between Raymond

Dabney and Young regarding the splitting of the proceeds from Young's sale of the Alliance shares.  On various occasions Richard Dabney contacted Young to arrange for Young to transfer the available funds to him which he purportedly needed for Alliance.

44.     Generally, Young transferred Alliance's share of the proceeds to an Alliance corporate bank account that was controlled by Richard Dabney, but sometimes Richard Dabney directed him to transfer the funds to Richard Dabney's personal bank account.

45.     On three occasions, Raymond Dabney instructed Young to transfer some of the proceeds to Raymond Dabney's personal bank account in Canada and, on another occasion, Raymond Dabney instructed Young to transfer funds to Lewis's personal bank account in Maine.

### 4.     Smith, Young, and O'Neal Sell Alliance Stock

46.     For his participation in the unregistered distribution, Smith received a total of 1,680,000 purportedly unrestricted shares of Alliance stock at no cost. Smith never intended to hold the stock for investment and, each time he received the Alliance shares, he deposited them into a brokerage account and sold them into the market shortly afterward.  Smith obtained net proceeds totaling $148,797.72 when he sold the Alliance stock.

47.     Through his participation in the unregistered distribution, Young received more than 27 million purportedly unrestricted shares of Alliance stock. He deposited the shares into a brokerage account that he controlled and obtained net proceeds of at least $357,276 by selling the shares into the market shortly afterward.

48.      As payment for his legal services to Alliance, O'Neal received more than 1,650,000 purportedly unrestricted Alliance shares through the unregistered distribution.  He deposited the shares into his brokerage account and sold them into the market shortly afterward for net proceeds of $163,246.22.

## CLAIMS

### FIRST CLAIM

### (Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Thereunder by Alliance, Lewis, and Richard Dabney)

49.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 47 above as if set forth fully herein.

50.     As set forth above, Alliance, Lewis, and Richard Dabney, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails or the facilities of a national securities exchange:  (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon any person.

51.     By reason of the foregoing, Alliance, Lewis, and Richard Dabney violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM

### (Violations of Section 5 of the Securities Act by Alliance,
### Richard Dabney, Raymond Dabney, Smith, and Young)

52.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 47 above as if set forth fully herein.

53.     As set forth above, Alliance, Richard Dabney, Raymond Dabney, Smith, and Young, directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to

14

sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

54.     No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings alleged herein.

55.     By engaging in the conduct described above, Alliance, Richard Dabney, Raymond Dabney, Smith, and Young violated, and unless restrained and enjoined will continue to violate, Section 5 of the Securities Act [15 U.S.C. § 77(e)].

## THIRD CLAIM

### (<u>Violations of Section 5 of the Securities Act by O'Neal</u>)

56.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 47 above as if set forth fully herein.

57.     As set forth above, O'Neal, directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

58.     No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings alleged herein.

59.     By engaging in the conduct described above, O'Neal violated, and unless restrained and enjoined will continue to violate, Section 5 of the Securities Act [15 U.S.C. § 77(e)].

# **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that the Court enter a final judgment:

## **I.**

Permanently enjoining Alliance, Lewis, and Richard Dabney from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## **II.**

Permanently enjoining Alliance, Richard Dabney, Raymond Dabney, Young, and Smith from violating, directly or indirectly, Section 5 of the Securities Act [15 U.S.C. § 77(e)];

## **III.**

Permanently enjoining O'Neal from violating, directly or indirectly, Section 5 of the Securities Act [15 U.S.C. § 77(e)];

## **IV.**

Permanently enjoining O'Neal from issuing any legal opinions to the effect that unregistered offerings are exempt from SEC registration under Rule 504 of Regulation D under the Securities Act [17 C.F.R. 230.504] and that securities issued in such Rule 504 offerings are unrestricted;

## **V.**

Permanently enjoining O'Neal from accepting securities of any issuer whose securities are quoted exclusively on the Pink OTC Markets quotation system formerly known as the Pink Sheets in consideration for legal or consulting services rendered;

## **VI.**

Ordering Raymond Dabney, Richard Dabney, Lewis, O'Neal, Smith, and Young to disgorge their ill-gotten gains, plus prejudgment interest;

**VII.**

Ordering Raymond Dabney, Richard Dabney, Lewis, O'Neal, Smith, and Young to pay civil money penalties;

**VIII.**

Permanently barring Raymond Dabney, Richard Dabney, Lewis, Smith, and Young from participation in any offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock under Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

**IX.**

Permanently barring Richard Dabney and Lewis from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act; and

**X.**

Ordering such other relief as the Court deems just and proper.

DATED this 8th day of  August, 2008.


/s/ Deena_R. Bernstein

Deena R. Bernstein (Ga. Bar 054068)
U.S. Securities and Exchange
    Commission
Senior Trial Counsel
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
Telephone:  (617) 573-8813 (Bernstein)
Facsimile:  (617) 573-4590
E-mail:   bernsteind@sec.gov